**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| CARLO M. CROCE | Case No. 2:23-cv-02896 |
| Plaintiff, | Judge Morrison |
| vs. | Magistrate Judge Vascura |
| SOTHEBY'S FINANCIAL SERVICES, INC., *et al.* | **AFFIDAVIT OF ZACHARY C. SCHAENGOLD IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR LEAVE TO AMEND** |
| Defendants. | |

Zachary C. Schaengold, being duly deposed and states:

1. My name is Zachary C. Schaengold. My business address is Robbins, Kelly, Patterson & Tucker, LPA, 312 Elm Street, Suite 2200, Cincinnati, Ohio 45202-2417.

2. This Affidavit is based upon my personal knowledge, and I am competent to testify to the matters herein.

3. I am an attorney admitted to the practice of law in the State of Ohio and am counsel for Defendants in the above-captioned case.

4. Attached hereto as Exhibit A is a true and accurate copy of the May 23, 2024 Motion of Receive to Employ Sotheby's as an Auctioneer, to Sell Certain Art of the Defendant, and Request for an Immediate Hearing. I obtained this by downloading it from the public-facing docket on the website hosted by the Franklin County Clerk of Court.

5.  Attached hereto as Exhibit B is a true and accurate copy of the Order Granting the Receiver's May 23, 2024 Motion. I obtained this by downloading it from the public-facing docket on the website hosted by the Franklin County Clerk of Court.

6.  Attached hereto as Exhibit C is a true and accurate copy of the First Report of the Receiver and Receivership Plan related to the sale of Plaintiff Croce's art, filed on June 7, 2024. I obtained this by downloading it from the public-facing docket on the website hosted by the Franklin County Clerk of Court.

7.  Through communication with cocounsel and my client, I am aware that the painting identified as Guercino's "An old man wearing a turban and a fur-lined coat, here identified as Annas" sold at auction on or about December 4, 2024 for £80,000 plus a buyer's premium, for a total of £96,000.

Further affiant sayeth not.

_____
Zachary C. Schaengold (0090953)

Sworn to and subscribed in my presence this 13th day of December, 2024.

Ashley Ryan Clark
Notary Public, State of Ohio
My Commission Expires:
August 29, 2026

_____
Notary Public

05418620-1

# EXHIBIT A

## IN THE COURT OF COMMON PLEAS
## FRANKLIN COUNTY, OHIO
### GENERAL DIVISION

| | | |
|---|---|---|
| Kegler, Brown, Hill & Ritter Co., LPA, | : | Case No.: 20CV-3954 |
| | : | |
| Plaintiff, | : | |
| vs. | : | Judge Bill Sperlazza |
| | : | |
| Carlo M. Croce, | : | |
| | : | |
| Defendant. | : | |

## MOTION OF RECEIVER (A) TO EMPLOY SOTHEBY'S AS AN AUCTIONEER (B) TO SELL CERTAIN ART OF THE DEFENDANT; AND (C) REQUEST FOR AN IMMEDIATE HEARING

Myron N. Terlecky, the court-appointed receiver for certain assets of Defendant Carlo M. Croce (the "Defendant"), hereby moves the Court for an Order authorizing the employment of Sotheby's to sell at auction, certain property of the Defendant as more fully set forth in the accompanying memorandum in support. Further, because of time constraints associated with the proposed auction sale, an immediate hearing is requested.

A memorandum in support follows.

Respectfully submitted,

 /s/ Myron N. Terlecky
Myron N. Terlecky (0018628)
Strip, Hoppers, Leithart, McGrath & Terlecky Co., LPA
575 South Third Street
Columbus, Ohio 43215-5759
T: (614) 228-6345     F: (614) 228-6369
Email: mnt@columbuslawyer.net
Receiver

## MEMORANDUM IN SUPPORT

1.     Myron N. Terlecky is the court-appointed receiver (the "Receiver") for certain assets of Defendant.

2.     On April 11, 2024, the Court entered its *Order Appointing Receiver* (the "April 11 Order"). The Receiver accepted his appointment with the execution of the *Notice of Filing the Bond of Receiver* filed on April 19, 2024.

3.     Pursuant to the terms of the April 11 Order, the Receiver has reviewed the inventory of certain Old Master paintings and drawings owned by the Defendant. (collectively the "Art").

4.     The Receiver has been in contact with Sotheby's, which, upon information and belief, is a multi-national corporation headquartered in New York City, to sell certain pieces of the Art. Sotheby's is one of the world's largest brokers of fine art.

5.     In working with Sotheby's, certain pieces of the Art have been identified as being able to be sold to satisfy the claims of the Plaintiff in accordance with the terms of the April 11 Order. Sotheby's is proposing to sell certain of the group of paintings from the Art collection of Defendant at a July 3-4, 2024, sale of old master paintings in London, England (the "July Art Auction"). Attached hereto as Exhibit A is a draft of property of the Defendant and an auction estimate listing prepared by Sotheby's. Attached as Exhibit B is the Consignment Agreement with Sotheby's which sets forth the commission to be charged.

6.     Because of the time constraints in preparing for the July Art Auction, Sotheby's will need to pick up the Art as soon as possible, but no later than the first week in June 2024. For that reason, an immediate hearing is requested.

7.     In working in conjunction with counsel for Defendant, the Receiver, rather than seeking to sell all paintings identified in the attached Exhibit A, has agreed with the Defendant to

sell those paintings identified as Paintings 2, 3 and 5 listed on Exhibit A, specifically the *Man with Turban, Saint Cecilia Playing the Organ*, and *Madonna Surrounded by Musical Angels*.

8.     The relevant terms of the sale are that Sotheby's will charge and retain a seller's commission equal to ten percent (10%) of the sale price, subject to a maximum of £40,000[1] and a £500 charge for any unsold item.  If the sale price is greater than the final high estimate, a success fee equal to two percent (2%) of the sale price will also be charged. Further, there will be sale costs charged associated, such as transporting the Art to London.

Based on the foregoing, the Receiver moves the Court for an Order authorizing him to sell the Art as described herein, to pay to Sotheby's the commission and associated expenses from the sale proceeds, and granting such other relief as is appropriate.

Respectfully submitted,


 /s/ Myron N. Terlecky
Myron N. Terlecky (0018628)
Strip, Hoppers, Leithart, McGrath & Terlecky Co., LPA
575 South Third Street
Columbus, Ohio 43215-5759
T: (614) 228-6345     F: (614) 228-6369
Email: mnt@columbuslawyer.net
Receiver

---

[1] The commission is listed in English currency.  The current conversion rate is $1.27 to 1 Pound Sterling.

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that on May 23, 2024, a copy of the foregoing MOTION OF RECEIVER (A) TO EMPLOY SOTHEBY'S AS AN AUCTIONEER (B) TO SELL CERTAIN ART OF THE DEFENDANT; AND (C) REQUEST FOR AN IMMEDIATE HEARING was submitted to the Court electronically and served on the following registered eFiling participants, **electronically**, through the Court's eFiling system at the email address registered with the Court:

Electronic Service through the Court's eFiling system is proper pursuant to Section X(C)1 of the Franklin County Court of Common Pleas Second Amended Administrative Order regarding electronic filing of court documents.

And by regular U. S. mail service, postage prepaid, as follows:

/s/ Myron N. Terlecky
Myron N. Terlecky (0018628)

# EXHIBIT A

Property of Carlo Maria Croce



Franklin County Ohio Clerk of Courts of the Common Pleas- 2024 May 23 3:14 PM-24CV003954
Case No. 18-0896-SC Clerk of Courts of the Common Pleas 2024 May 23 3:14 PM-20CV003623

# Property of Carlo Maria Croce

AUCTION ESTIMATE LISTING

Franklin County Ohio Clerk of Courts of the Common Pleas- 2024 May 23 1:47 PM-20CV003954

SUMMARY

AUCTION ESTIMATE

| PAGE | | VALUE |
|------|-----------------|-------------------|
| 4 | July 2024, London | $490,000 - 740,000 |

The enclosed estimates are preliminary only and subject to change based on firsthand inspection and further research. We have provided the enclosed estimates based on our assumption that the property can be offered freely and openly in the international art market.



ARTIST INDEX

**1**
64DXY

## VIRGINIA DA VEZZO
*Allegory of painting*
Oil on canvas
95 by 132 cm

$200,000 - $300,000

(£150/200,000)



LITERATURE
C. Lollobrigida, "Virginia da Vezzo tra Roma e Parigi, Verso un primo catalogo ragionato," in *Scritti di donne, 40 Studiose per la storia dell'arte*, Folgino 2022, p. 249, reproduced fig. 3 (as Virginia da Vezzo, *Allegory of painting*).

Previous Values

| Date | Type | Value | Cur. | Source |
|------|------|-------|------|--------|
| 13 May 11 | FMV | 300,000 | USD | 0070224641 |

**2**
64FDZ

## GIOVANNI FRANCESCO BARBIERI, CALLED IL GUERCINO
*Man with Turban*
Oil on canvas
87.6 by 65 cm

$100,000 - $150,000

(£80/120,000)



PROVENANCE
Anonymous sale, Paris, Piasa, 25 June 1999, lot 4 (as Attributed to Guercino);
Cesare Lampronti;
From whom acquired by the present collector.

Previous Values

| Date | Type | Value | Cur. | Source |
|------|------|-------|------|--------|
| 13 May 11 | FMV | 500,000 | USD | 0070224641 |

ARTIST INDEX

**3**
CM9DC

## ANTIVEDUTO GRAMATICA
*Saint Cecilia Playing the Organ*
Oil on canvas

$80,000 - $120,000

(£60/80,000)



**4**
CM9D6

## BARTOLOMEO SCHEDONI
*Beheading of Saint John the Baptist*
Oil on walnut panel

$80,000 - $120,000

(£60/80,000)

LITERATURE
E. Negro, in *Ducato di Modena & Reggio 1598-1859: Lo stato, la corte, le arti*, P.V. Ferrari (ed.), Modena 2007, p. 223, fig. 12 (as Costabili version);
N. Roio, "Bartolomeo Schedoni e Leonello Spada, alcune opere sconosciute di due 'caravaggisti' padani" in *Valori Tattili* 1 (2013), p. 53, reproduced fig. 7.



**5**
CM9DH

## CARLO MARATTA
*Madonna Surrounded by Musical Angels*
Oil on canvas
74 by 62 cm

$30,000 - $50,000

(£20/30,000)

PROVENANCE
Private collection, Rome;
Anonymous sale, Lempertz, 12 May 2012, lot 1259A, where unsold.



# EXHIBIT B

# Sotheby's

34-35 New Bond Street
London W1A 2AA UK
+44 (0)20 7293 5000 SOTHEBYS.COM

**CONSIGNMENT AGREEMENT**

May 17, 2024
Consignment Number: 40372336
Account Number: 53160504

**PART A**

Myron Terlecky, Esq.
Strip, Hoppers, Leithart, McGrath & Terlecky Co., LPA
575 South 3rd St.
Columbus
OH 43215 USA

This consignment agreement, which includes Parts A, B and C, sets out the terms on which you consign the Property listed on the Property Schedule in Part B to us for sale. References in this agreement to Clauses are to the numbered provisions set out in Part A, and references to numbered Conditions are to the Conditions of Business for Sellers set out in Part C. Condition 1 contains the definitions of capitalized terms not defined in this Part A.

1. **THE SALE:** We shall offer the Property for sale in the sale(s) set out in the Property Schedule, on the terms of this agreement and in accordance with the Conditions of Business for Buyers, to which you hereby agree to be bound. Our current pre-sale estimates and the Reserve are set out in the Property Schedule, subject to Condition 3. The US Dollar equivalent of the Pounds Sterling pre-sale estimates, calculated at the exchange rate quoted by a financial institution designated by us as of the date of this agreement and rounded up or down to the nearest commercially acceptable estimate, are set out in Part B for illustrative purposes only. For the avoidance of doubt, the Property will be offered for sale with pre-sale estimates in Pounds Sterling as set out in the Property Schedule, subject to Condition 3. You authorize us to charge the Buyer and to retain for our own account the Buyer's Premium and any applicable Overhead Premium.

2. **THE PROPERTY:** You shall deliver the Property to us or make it available for us to collect, unless it is already in our custody or control.

3. **SELLER'S COMMISSION:** We will charge you and retain for our own account a Seller's Commission equal to 10% of the Hammer Price, subject to a maximum of £40,000 per Lot and minimum of £500 per Lot. The £500 per Lot minimum Seller's Commission will also apply for any unsold Lot with a low estimate of £5,000 or below. In addition, if the Hammer Price for a Lot is greater than its final high estimate, we will charge you and retain for our own account a success fee equal to 2% of its Hammer Price (and references in this agreement to the Seller's Commission will be deemed to include this success fee), provided that the Net Sale Proceeds (as defined below) due to you are not less than if the Lot had sold at its final high estimate.

4. **SALE COSTS:** Sale Costs will apply and will be charged to you as set out in the Sale Costs Schedule in Part B of this agreement.

5. **LOSS OR DAMAGE:** We will assume liability, at no cost to you, for loss or damage to the Property on the terms set out in Condition 7.

**Sotheby's**

6. **EXTENDED PAYMENT TERMS:** You agree we may permit the Buyer to pay the Purchase Price on extended payment terms, in one or more interest-free payments over a period of up to 90 days after the sale. If extended payment terms are granted, after the sale we will notify you and provide the date or dates on which the Net Sale Proceeds (as defined below) will be due to you and the amount of each installment, if applicable.

7. **SETTLEMENT:** We will pay you the Net Sale Proceeds on the relevant Settlement Date (as defined below), subject to Condition 13. The "**Net Sale Proceeds**" are the amount remaining from the Hammer Price we receive in cleared funds after deducting the Seller's Commission and Sale Costs payable by you. The "**Settlement Date**" will be the date that is the later of (i) 45 days after the last session or closing date (as applicable) of the relevant sale in which the Property is offered, and (ii) five business days after our receipt of the Purchase Price in full and in cleared funds. If extended payment terms have been granted in accordance with the above provision, the Settlement Date(s) will instead be the date that is the later of (i) five business days after payment is due from the Buyer (or in the case of installment payments, five business days after each installment is due from the Buyer), and (ii) five business days after our receipt of the Purchase Price in full and cleared funds (or in the case of installment payments, five business days after our receipt of each installment in full and cleared funds), but in no event earlier than 45 days after the last session or closing date (as applicable) of the relevant sale in which the Property is offered. If any Settlement Date falls on a Saturday, Sunday, public holiday or date on which our offices are closed, settlement will be on the next business day.

8. **CONSUMER CANCELLATION RIGHT:** You represent and warrant to us and the Buyer that the owner of the Property is not a Trader for the purposes of the Consumer Cancellation Right, as set out in Condition 14. Your indemnity as set out in Condition 6 will apply in connection with this representation and warranty.

9. **VAT:** You acknowledge that the Property has been or will be imported from outside the United Kingdom for sale in London and that we will be selling it under our Temporary Admission arrangement. We will charge the Buyer UK Import VAT at the prevailing rates on the Hammer Price and domestic UK VAT at the standard rate on the Buyer's Premium and any applicable Overhead Premium for the Property.

In addition to the foregoing and the information set out in Part B, you agree to the Conditions of Business for Sellers in Part C, as amended by Parts A and B if applicable (and in the event of a conflict, Parts A and B will prevail). The Conditions of Business for Buyers and your express representations and warranties and indemnity given in this agreement, together, are the entire agreement between us, you and the Buyer.

*[Signature page(s) to follow]*

# Sotheby's

By signing below, you confirm you have read and accept, and agree to the sale of the Property in accordance with, the terms of this agreement and the Conditions of Business for Buyers.

**Sotheby's**

By _____     Date _____

Name _____     Title _____


## ACCEPTED AND AGREED

**Myron Terlecky, Esq**, acting in their own capacity and as duly authorised agent for the owner, **Carlo Croce**

Signed: _____     Dated: _____

Name: _____     Title: _____

## Sotheby's

**PART B**

**SCHEDULE I – PROPERTY SCHEDULE**

### Item D267N – Virginia da Vezzo, Allegory of painting

| | |
|---|---|
| Low - High Estimates | £150,000 – £200,000 |
| Low - High Estimates in USD (for illustrative purposes only) | $200,000 – $300,000 |
| Reserve / Status | £150,000 / Suggested |
| Illustration Fee | £200 (if sold) £200 (if unsold) |
| Department | Old Master Paintings |
| Sale | L24033 JULY 2024 EVENING |
| Sale Location | London |
| Country of Export | USA |
| VAT symbol | Double Dagger |

### Item D267P – Giovanni Francesco Barbieri, called Il Guercino, Man with turban

| | |
|---|---|
| Low - High Estimates | £80,000 – £120,000 |
| Low - High Estimates in USD (for illustrative purposes only) | $100,000 – $150,000 |
| Reserve / Status | £80,000 / Suggested |
| Illustration Fee | £200 (if sold) £200 (if unsold) |
| Department | Old Master Paintings |
| Sale | L24034 JULY DAY 2024 |
| Sale Location | London |
| Country of Export | USA |
| VAT symbol | Double Dagger |

**Sotheby's** EST. 1744

**Item D267Q – Antiveduto Gramatica, Saint Cecilia playing the organ**

| | |
|---|---|
| Low - High Estimates | £60,000 – £80,000 |
| Low - High Estimates in USD (for illustrative purposes only) | $80,000 – $120,000 |
| Reserve / Status | £60,000.00 / Suggested |
| Illustration Fee | £200 (if sold) £200 (if unsold) |
| Department | Old Master Paintings |
| Sale | L.24034 JULY DAY 2024 |
| Sale Location | London |
| Country of Export | USA |
| VAT symbol | Double Dagger |

**Item D267R – Bartolomeo Schedoni, Beheading of Saint John the Baptist**

| | |
|---|---|
| Low - High Estimates | £60,000 – £80,000 |
| Low - High Estimates in USD (for illustrative purposes only) | $80,000 – $120,000 |
| Reserve / Status | £60,000.00 / Suggested |
| Illustration Fee | £200 (if sold) £200 (if unsold) |
| Department | Old Master Paintings |
| Sale | L.24034 JULY DAY 2024 |
| Sale Location | London |
| Country of Export | USA |
| VAT symbol | Double Dagger |

Sotheby's

**Item D267S – Carlo Maratta, Madonna surrounded by musical angels**

| | |
|---|---|
| Low - High Estimates | £20,000 – £30,000 |
| Low - High Estimates in USD (for illustrative purposes only) | $30,000 – $50,000 |
| Reserve / Status | £20,000.00 / Suggested |
| Illustration Fee | £200 (if sold) £200 (if unsold) |
| Department | Old Master Paintings |
| Sale | L24034 JULY DAY 2024 |
| Sale Location | London |
| Country of Export | USA |
| VAT symbol | Double Dagger |

Case: 2020-01899-01 CICACH Court of the Common Pleas 2024 May 23 of 14 PM 20CV003954 Franklin County Ohio Clerk of Courts of the Common Pleas- 2024 May 23 3:14 PM-20CV003954

# Sotheby's

**PART B**

**SCHEDULE II – SALE COSTS SCHEDULE**

The following Sale Costs will apply and be charged to you, if applicable:

(a)   a fee for catalogue illustration, production and distribution (if applicable as set out in the Property Schedule);

(b)   costs for packing, shipping, and any applicable customs duties, taxes or tariffs for shipping the Property to our sale location or warehouse;

(c)   costs for our travel to inspect and/or prepare the Property for transport;

(d)   costs of any agreed-upon marketing and advertising;

(e)   costs of reproduction rights;

(f)   authentication costs, including any related packing, shipping and customs duties;

(g)   costs of framing, cleaning and restoration, approved by you, and any related packing, shipping and customs duties;

(h)   costs of other services approved by you, including those performed by others and any related packing, shipping and customs duties; and

(i)   a fee for property handling and administration and our assumption of liability as described in the Clause titled "Loss or Damage" in Part A.

Sotheby's

*[Page intentionally blank]*

## PART C

### CONDITIONS OF BUSINESS FOR SELLERS

### 1. Defined Terms

In this agreement, "we", "us" and "our" refers to Sotheby's and "you" and "your" refer to the individual, corporation or other entity whose name appears at the top of Part A. If there is more than one consignor, "you" and "your" refer to all consignors; if the consignor is an agent acting on behalf of a principal, "you" and "your" refer to both principal and agent.

If there is more than one consignor consigning the Property under this agreement, each consignor, including any co-owner, jointly and severally assumes the consignor's obligations and liabilities under this agreement. If you are an agent acting on behalf of a principal, you and your principal are bound by the terms of this agreement and jointly and severally assume all obligations, liabilities, representations, warranties and indemnities set out in this agreement.

The following capitalized words will have the specific meaning shown here.

**Authenticity Guarantee:** the guarantee we provide as principal to the Buyer in relation to a purchased lot, as set out in the Conditions of Business for Buyers.

**Buyer:** the buyer of record of an item of Property.

**Buyer's Premium:** the premium the Buyer must pay. The Buyer's Premium rate, which is a percentage of the Hammer Price, is set out in the Conditions of Business for Buyers. Buyer's Premium is subject to any applicable VAT.

**Buy-Now Marketplace:** our online marketplace operated and available through our online platform.

**Conditions of Business for Buyers:** the terms and conditions for the Buyer and bidders that are applicable to the sale in which the Property will be offered, which will be set out on our website in advance of the sale in which the Property is scheduled to be offered, and as amended by any announcement or posted notices. In relation to a sale, where applicable, any reference by us to "Conditions of Sale" should be understood to mean the Conditions of Business for Buyers.

**Hammer Price:** the last price accepted for the item by the auctioneer or acknowledged by our online platform, or in the case of a post-auction sale, the agreed sale price. The Hammer Price is subject to any applicable VAT.

**Lot:** an item (or more than one item grouped as one) of Property offered for sale at auction.

**Overhead Premium:** the fee the Buyer must pay as an allocation of overhead costs relating to our facilities and other administrative expenses. The Overhead Premium rate, which is a percentage of the Hammer Price, is set out in the Conditions of Business for Buyers. Overhead Premium is subject to any applicable VAT. For any auctions closing on or after May 20, 2024, the Overhead Premium will only apply to the sale of wine and spirits.

**Property:** an item of property consigned by you under this agreement and listed in the Property Schedule in Part B. Where more than one item of property is consigned,

references to "Property" in this agreement will mean with respect to each item of Property.

**Purchase Price:** the Hammer Price plus the Buyer's Premium, Overhead Premium (as applicable), any applicable VAT and/or sales or use tax, and any applicable artist resale right royalty payable by the Buyer on qualifying Property.

**Reserve:** the confidential minimum price agreed with you at which the Property can be sold. Where more than one item of property is consigned, references to "Reserve" in this agreement will mean with respect to each item of Property.

**Sale Costs:** the costs related to this consignment set out in the Sales Costs Schedule in Part B. Sale Costs are subject to any applicable VAT.

**Seller's Commission:** the amount we will charge you as a commission, which we will retain for our account. Seller's Commission is subject to any applicable VAT.

**Sotheby's:** the unlimited company that has its registered office at 34-35 New Bond Street, London W1A 2AA, United Kingdom.

**Sotheby's Group:** Sotheby's Holdings UK Limited and any entities in which it holds, from time to time, directly or indirectly, more than 50% of the issued share capital; and each, a "**Sotheby's Group Company.**"

**VAT:** for Property sold in a location in which a Value Added Tax (or similar tax) regime applies, any applicable Value Added Tax or an amount in lieu of Value Added Tax (or similar tax), as the case may be, at the prevailing rate.

### 2. Consignment

**(a)** You retain us as your exclusive agent to offer the Property for sale on the terms set out in this agreement. While we are your exclusive agent, you may not offer or attempt to offer the Property for sale other than pursuant to the terms of this agreement.

**(b)** For this consignment, we will determine (i) the cataloguing and other descriptions of the Property, (ii) the grouping of items of Property in each Lot , (iii) the date(s) of the sale(s), (iv) any marketing, promotion and exhibition of the Property, unless specifically agreed with us in writing, (v) the manner of conducting the sale(s) (including setting the starting bid), and (vi) whether Property will be offered for sale as a "premium Lot," which may require additional information from prospective bidders as set out in the Conditions of Business for Buyers. We may (though we have no duty to), before and after the sale(s), consult an expert or experts and conduct due diligence and research in relation to the Property or its provenance.

**(c)** We may from time to time decide to change the sale and/or platform in which we will offer the Property for sale (including but not limited to from a live auction to a timed online-only auction). In any such case, we will notify you of the new sale and/or sale platform and provide the details and terms relevant to the new sale and/or platform. Unless you object in writing by the earlier of (i) seven days of our notice to you, or (ii) one day prior to the start of the relevant sale, the Property Schedule will be deemed amended, we will offer the Property in the new sale and/or on the new platform, and the sale of the Property will be subject to the Conditions of Business for Buyers

applicable to the relevant sale or platform. However, you will not have the right to object to a change if such change is due to a Force Majeure Event, in which case Condition 20(b) shall apply.

### 3. Estimates and Reserves

**(a)** Any oral or written pre-sale estimates are our non-binding opinion only. Estimates are not to be relied upon as a prediction of the selling price or value of the Property. We may revise estimates from time to time prior to the sale in our sole discretion.

**(b)** The Reserve will be the amount shown on the Property Schedule or, if it is not shown there, 60% of the low estimate (which may be rounded up to the next applicable increment in the case of a timed online-only auction), unless otherwise agreed with you prior to the sale. The Reserve cannot be higher than the final low estimate.

**(c)** Property offered without a Reserve will be identified as such on the Property Schedule, and in the online listing and sale catalogue or in a salesroom announcement. You acknowledge that any Property that will be offered for sale without a Reserve might sell for a price much lower than its low estimate.

**(d)** We will not be liable if bidding does not reach the Reserve. In any such case, however, we may sell Property at a price below the Reserve provided we pay you the Net Sale Proceeds you would have been entitled to receive had the Property sold at the Reserve.

### 4. Consignor Bidding

You may not, and you shall ensure that any Interested Party (as defined below) does not: (a) bid on the Property, (b) permit any other person to do so on your or their behalf (other than to the extent we may bid on your behalf up to but not including the Reserve), or (c) have any agreement or arrangement with a bidder in connection with the Property. If you or an Interested Party does so, we may (i) regard you or them as the Buyer, but without the benefit of the Authenticity Guarantee, (ii) disregard and cancel any of the bids or the bids of any person bidding on your or an Interested Party's behalf or in connection with any agreement or arrangement with you or an Interested Party, and/or (iii) pursue other rights or remedies we have, including rescinding the sale, reselling the Property without a Reserve and/or charging you the Seller's Commission, Sale Costs, Buyer's Premium, Overhead Premium (as applicable) and any applicable artist resale right royalty payable by the Buyer on qualifying Property. If the sum of these amounts is less than what we would have received had the Property been sold to you, we will, in addition, deduct and keep for our own account from the sale proceeds the deficit. An "**Interested Party**" means any party (x) with a direct or indirect financial interest in the sale of the Property under this agreement, or (y) who has worked in connection with the sale of the Property under this agreement.

### 5. Representations and Warranties

You represent and warrant to us and to each Buyer that at all relevant times (including at the time of consignment and at the time of sale of the Property):

**(a)** you have sole, complete and lawful right, title and interest in the Property; or, if you are acting as an agent,

9

# Sotheby's

your principal has sole, complete and lawful right, title and interest in the Property, and you are properly authorized by your principal to sell the Property on these terms;

**(b)** there are no claims or potential claims, legal proceedings, liens, security interests, encumbrances or other restrictions on or regarding the Property, and you have no knowledge of any facts or circumstances that might give rise to any claims in connection with the Property;

**(c)** good and marketable title to and right to possession of the Property will pass to the Buyer free from any third-party rights, liens, security interests, claims or potential claims, restrictions or encumbrances;

**(d)** you have disclosed to us all information (including documents) known to you or in your possession that might affect the sale or value of the Property, including but not limited to information concerning the Property's condition (including any damage or restoration), provenance, ownership, authenticity, attribution, authorship, origin, date, age, period, culture, source, export or import history, and the existence of any endangered or protected species in the Property, as applicable, and you shall continue to disclose any such information that becomes known to you up to and including the date on which the Property is sold;

**(e)** if the Property has been imported into the country in which it is located, it was lawfully imported, required declarations were made, any duties and taxes were paid, and it was lawfully exported from the country or jurisdiction in which it had been located;

**(f)** you have notified us in writing of any taxes and/or duties that are payable by us on your behalf in any country other than the country of the applicable sale location;

**(g)** any images and descriptions of the Property you provide to us do not infringe any third-party rights; and unless you advise us in writing to the contrary at the time of consignment, you are not aware of any restrictions on our right to reproduce or use photographs, images or videos of the Property produced by us to the extent permitted by applicable law;

**(h)** unless you advise us in writing to the contrary at the time of consignment, any electrical or mechanical goods or components are in a safe operating condition if reasonably used for the purpose for which they were designed, and are free from any defect not obvious on external inspection which could prove dangerous to human life or health;

**(i)** you have not violated and will not violate any applicable law, regulation or code in connection with this consignment or the sale of the Property;

**(j)** your consignment of the Property for sale does not facilitate tax crimes;

**(k)** you have no knowledge or reason to suspect that (i) the Property is connected with the proceeds of criminal activity, or (ii) you, or any co-owner(s) or principal(s) (or, if you are an entity, any person(s) or entity(ies) with a beneficial or ownership interest in you), are under investigation, charged with, or convicted of any substantive or predicate money laundering or economic sanctions crime, terrorist activity, tax evasion or act in violation of any applicable anti-bribery or anti-corruption law;

**(l)** you (and your principal, if applicable) are not, nor are you or your principal (if applicable) owned, controlled, or

acting on behalf of, an entity or individual that is: (i) the subject of economic sanctions, embargoes or other trade restrictions in any jurisdiction, including those administered and enforced by the United States, European Union, United Kingdom, United Nations Security Council, or other applicable sanctions authority (collectively, "**Sanctions**"), or (ii) located, organized, or resident in a country or territory that is the subject of Sanctions (including, without limitation, Crimea, Cuba, Iran, North Korea, Syria, Russian Federation and Belarus) (collectively, "**Sanctioned Jurisdictions**"); and you will not transfer the Net Sale Proceeds to, or use them for the benefit of, anyone that is the subject of Sanctions or located, organized, or resident in a Sanctioned Jurisdiction;

**(m)** if you are acting as agent on behalf of a principal, you have disclosed to us the identity of your principal and have taken steps reasonably designed to ensure compliance with Sanctions, anti-money laundering, anti-terrorism, and anti-bribery or anti-corruption laws, including but not limited to, conducting appropriate due diligence on your principal, and all commissions payable to you for this consignment have been authorized by your principal; and

**(n)** you have full legal authority without any further action or other party's consent to enter into and perform this agreement and to give these representations and warranties; if you are an entity, the individual signing on your behalf is authorized to do so and the entity is duly incorporated or formed, validly existing and in good standing in the jurisdiction where it is incorporated or formed.

## 6. Indemnity

You shall indemnify and hold us, each Sotheby's Group Company, our and their respective officers and employees, and the Buyer harmless against any and all claims, causes of action, liabilities, damages, losses, and expenses (including but not limited to reasonable attorneys' fees), arising out of or in connection with an inaccuracy, incompleteness or breach of any of your representations or warranties under this agreement.

## 7. Our Loss or Damage Liability

**(a)** If any Property will be in our custody or control, this Condition 7 will apply with regard to such Property. Subject to Condition 7(b) and unless otherwise agreed with us in writing in accordance with Condition 8, we assume liability for loss or damage to the Property, commencing from when we or our designated agent receive the Property and ceasing (i) for sold Property, when risk passes to the Buyer following its sale; (ii) for unsold Property, on the earlier of 60 days after the sale in which it was offered or when the Property is released to you; or (iii) six months after our receipt of the Property if it is not consigned for sale.

**(b)** We will not be liable for any loss or damage (i) occurring during any process undertaken by independent contractors engaged with your consent, including but not limited to for restoration, conservation, (un)framing, (un)mounting or cleaning; (ii) caused to frames or to glass covering prints, paintings or other flat works; or (iii) caused by changes in humidity or temperature (as long as we take reasonable care in handling the Property), normal wear and tear, gradual deterioration or inherent vice or defect (including woodworm), war, any act or acts of terrorism (as defined by our insurers), nuclear fission, radioactive

contamination, or chemical, bio-chemical or electromagnetic weapons.

**(c)** If any loss or damage occurs to the Property during the period identified in Condition 7(a), we will determine the extent of depreciation to the Property (after restoration), if any, caused by the loss or damage, and our liability to compensate you in respect of that loss will be limited to the Property Value, less the Seller's Commission and Sale Costs payable by you, if any. As used in this agreement, the "**Property Value**" will mean the amount equal to: (i) for sold Property, the Hammer Price, (ii) for unsold Property, the Reserve, or (iii) for Property not yet offered for sale, the mid-estimate.

**(d)** If, in our reasonable opinion, the loss or damage to the Property results in a depreciation of the Property (after restoration), if any, of less than 50%, we will pay you the amount of depreciation and offer the Property for sale or, at your request, return it to you, subject to Condition 16. If, in our reasonable opinion, the loss or damage to the Property results in a depreciation of the Property of 50% or more, we will pay you the Property Value, less the Seller's Commission and Sale Costs payable by you, if any, and all title, interest and rights to the Property will pass to us.

**(e)** If you disagree with our opinion as to the depreciation of the Property, we will solicit an appraisal from an independent expert recognized in the relevant field whose selection you approve, such approval not to be unreasonably withheld. You and we agree that such appraisal will be the final determination.

**(f)** Upon your receipt of payment from us in accordance with this Condition 7, you, on your own behalf and on behalf of your insurer(s), irrevocably release us from all liability for loss or damage to such Property and irrevocably waive all rights and claims that you might have against us in connection with the same.

## 8. Seller's Loss or Damage Liability

If you do not wish for us to assume liability for loss or damage to the Property that will be in our custody or control as set out in Condition 7 above, you and we must agree to do so in Part A of this agreement or otherwise in writing. In any such case, you shall maintain insurance cover for the Property until the Buyer has paid for it in full. You also agree to: (i) provide us with a certificate of insurance for the Property and a waiver of subrogation by your insurer of all rights and claims that you might have against us, each in a form satisfactory to us; (ii) indemnify and hold us harmless against all claims, causes of action, losses and liabilities, including reasonable attorneys' fees, arising from loss or damage to the Property; (iii) notify your insurer of the terms of the indemnity set out in (ii) above; and (iv) irrevocably waive all rights and claims that you might have against us, each Sotheby's Group Company, our and their respective officers and employees, and our agents or warehouses in connection with or arising out of such loss or damage, except where the loss or damage was caused by our gross negligence or willful misconduct. If you fail to comply with this Condition 8 within ten days of our receipt of the Property, we will assume liability for loss or damage to the Property in accordance with Condition 7 from the following day, but our liability will be limited to the excess (if any) of (A) the amount set out in Condition 7(c) over (B) any amount

10

0G865 - W97

Sotheby's

payable to you under your own insurance plus any applicable deductible.

## 9. Withdrawal

**(a)** We may, in our sole discretion, withdraw any Property from sale if we reasonably determine there are serious grounds for concern (i) as to the Property's authenticity or attribution, (ii) that any of your representations or warranties are inaccurate, incomplete or breached, (iii) you have materially breached any other provision of this agreement, (iv) the Property suffers loss or damage and is not in the condition in which it was when we agreed to offer it for sale, (v) the Property requires but lacks the necessary export license and/or the appropriate Convention on International Trade in Endangered Species license or exemption, or (vi) the sale has subjected or might subject us or you to legal liability or damage to our reputation or brand.

**(b)** If you withdraw any Property from sale after you sign this agreement, you agree to pay the Withdrawal Fee, as defined in Condition 9(c). You may not, however, withdraw any Property from sale once the Reserve for the Property has been met.

**(c)** The "**Withdrawal Fee**" is the sum of the Seller's Commission as set out in Part A, Buyer's Premium and Overhead Premium (as applicable), each at the rates current when the Property was consigned and in each case calculated as if the withdrawn Property had sold at the mid-estimate, plus any Sale Costs we incurred prior to the withdrawal of the Property. You agree that the Withdrawal Fee is a reasonable estimate of the harm to us that would result from withdrawal of the Property.

**(d)** If Property is withdrawn pursuant to Condition 9(a)(iii), 9(a)(iii) or 9(b), we will charge you the Withdrawal Fee. If Property is withdrawn pursuant to Condition 9(a)(v) or 9(a)(vi), we may charge you the Withdrawal Fee if you failed to disclose to us prior to the sale facts or circumstances material to our determination. We will not charge you the Withdrawal Fee if Property is withdrawn pursuant to Condition 9(a)(i) or 9(a)(iv).

**(e)** In any case where you owe us the Withdrawal Fee, you shall promptly pay us upon our request to you, and following our receipt of the Withdrawal Fee (unless otherwise agreed with you), we will withdraw the Property from sale and, if applicable, return it to you at your expense, subject to Condition 16. We will determine the timing and content of any announcement regarding any withdrawal of Property, provided that such announcement will not disparage you.

## 10. Post-Auction Sales

If the Property fails to sell at auction, you authorize us to sell it in a post-auction sale during the period of 40 days following the auction, for a price that will result in payment to you of an amount of no less than the Net Sale Proceeds that would have been due to you had the Property sold at the Reserve at auction or for a price agreed by you and us in writing. In such event, your obligations to us are the same as if such Property had sold at auction, and any reference in these Conditions or in the Conditions of Business for Buyers to the date of the sale will be deemed to be the date of the post-auction sale.

## 11. Unsold Property

**(a)** If the Property remains unsold after the period for post-auction sales set out in Condition 10, we will notify you. In such case, we may agree with you that the unsold Property will be offered for sale again or you may collect it, if applicable.

**(b)** For unsold Property in our custody or control, if within 30 calendar days (or 60 calendar days if you are a Sotheby's Preferred member) of the sale we do not agree to reoffer the Property for sale and you neither collect it nor instruct us to arrange return shipment at your cost and risk, we may (i) return it to you at your cost and risk, (ii) sell it through Sotheby's or elsewhere, with estimates and reserves at our discretion (including without reserve), (iii) store it at your risk and expense, for which we will charge you our standard late collection fees applicable at the relevant time and place and published on our website, or (iv) store it at a third-party warehouse, at your risk and expense.

**(c)** If we decide to offer the Property for sale pursuant to Condition 11(b)(ii), we will be entitled to sell such Property after 30 days' written notice to you (with email to suffice). If the Property sells, we will be entitled to deduct from the sale proceeds any commissions applied on the sale by the relevant auctioneer, and if the sale is by Sotheby's, we will charge and deduct our standard Buyer's Premium, Overhead Premium (as applicable) and Seller's Commission or an equivalent private treaty commission, as applicable, which we will retain for our own account, and any costs we incur in selling the Property. Any balance of the sale proceeds will be remitted to you in accordance with the payment instructions you have given. Any such sale conducted by a Sotheby's Group Company will be conducted under the Conditions of Business for Buyers applicable to the relevant sale. If you fail to collect your sale proceeds within six years of the sale, such proceeds will be forfeited by you and we shall have the right to retain such balance for our own account.

## 12. Payment from the Buyer

**(a)** For Property sold, title to the Property will transfer to the Buyer upon our receipt of the Purchase Price in full and in cleared funds from the Buyer.

**(b)** We have no obligation to enforce payment by the Buyer. We will use commercially reasonable endeavors to collect payment from the Buyer, but we will not be required to commence legal proceedings. If we charge the Buyer interest for late payment, you authorize us to retain such interest for our own account. We will take reasonable steps to inform you of any action being taken against the Buyer and consider your views.

**(c)** If we pay you any portion of the Purchase Price for which we have not collected payment from the Buyer, simultaneously with such payment, you hereby assign to us all rights you might have against such Buyer to the extent of such payment.

**(d)** If the Buyer fails to pay the Purchase Price in full and in cleared funds when due, we may, in our sole discretion, take and enforce any of the remedies set out in the Conditions of Business for Buyers, including cancelling the sale and returning the Property to you, if applicable. Alternatively, if we agree to remit to you an amount equal to the Net Sale Proceeds, ownership of the Property will pass to us, you shall have no right, title or interest in the Property, we will have full discretion as to the disposition

of the Property, all your representations, warranties and indemnity shall apply to us as the transferee of the Property, and we shall be entitled to enforce the rights of rescission set out in these Conditions of Business.

**(e)** If you take any action against the Buyer to enforce payment of the amount due to you, you will take reasonable steps to keep us informed. If you recover any funds from the Buyer, you agree to remit to us from such funds our share of the sale proceeds remaining, if any, after you first recover your costs (including reasonable attorneys' fees) incurred in collecting from the Buyer and the Net Sale Proceeds that were due to you.

## 13. Payment to You

**(a)** Payment will be made only to you in accordance with the payment instructions you will provide in a form satisfactory to us, provided that (i) you have satisfied our Know Your Client requirements, (ii) we are not aware of any circumstances that might give rise to rescission pursuant to Condition 15, (iii) if applicable, the Buyer has not exercised the Consumer Cancellation Right as set out in Condition 14, and (iv) if applicable, you have provided the required information under Condition 18. Further, with respect to any Property sold in the United Kingdom, the European Union or Switzerland, in circumstances where the Consumer Cancellation Right applies, settlement of the Net Sale Proceeds will be on the later of the Settlement Date or upon the expiration of the Consumer Cancellation Period as defined in Condition 14(a). If you request payment in a currency other than the currency of the sale, we will convert the Net Sale Proceeds into the currency of your choice (but not including cryptocurrencies) based on the exchange rate quoted by a financial entity designated by us on the date on which we pay you.

**(b)** If payment will be made to you in cryptocurrency, you represent and warrant the following: (i) you own the digital wallet used to receive payment; (ii) the digital wallet or account is not directly or indirectly hosted, operated, or otherwise controlled by anyone that is the subject of Sanctions or located, resident, or organized in a Sanctioned Jurisdiction. You agree to provide documentation reasonably requested to confirm that you own the wallet used to receive payment.

**(c)** You irrevocably release us from and waive all claims that you might have against us for any loss or damage you sustain due to our reliance upon your payment instructions, except where the loss or damage was caused by our gross negligence or willful misconduct.

**(d)** If we have custody of the Property and release it to the Buyer before our receipt of the Purchase Price in full, we will pay you an amount equal to your portion of the Purchase Price, regardless of whether we have collected payment in full from the Buyer, as follows: (i) if no extended payment terms have been granted to the Buyer, on the later of 45 days after the sale (except that if the definition of "Settlement Date" in Part A refers to the payment on another day, then such other day) or within five business days of our release of the Property, or (ii) if extended payment terms have been granted to the Buyer, the portion of the Purchase Price corresponding to each payment installment will be paid on the later of the relevant installment payment date or within five business days of our release of the Property. Where we pay you your portion of the Purchase Price before we are paid in

11

full by the Buyer, ownership of the Property will pass to us, you shall have no right, title or interest in the Property, we will have full discretion as to the disposition of the Property, all your representations, warranties and indemnity shall apply to us as the transferee of the Property, and we shall be entitled to enforce the rights of rescission set out in these Conditions of Business.

### 14. Consumer Cancellation

**(a)** If a Buyer in a timed online-only auction or any other distance sale is a Buyer acting for purposes that are wholly or mainly outside the Buyer's trade, business, craft or profession who habitually resides in the European Union or United Kingdom (a "**Consumer**") and you are or, where you are acting as agent, the owner of the Property is, a "trader" (namely someone acting for purposes relating to their trade, business, craft or profession, whether acting personally or through another person acting in the trader's name or on the trader's behalf (a "**Trader**")), then the Buyer has the right to cancel the online purchase of goods (the "**Consumer Cancellation Right**") during the period of 14 calendar days after the Buyer or their designated agent (other than the carrier) acquires physical possession of the Property (the "**Consumer Cancellation Period**").

**(b)** If the Buyer exercises the Consumer Cancellation Right, we will notify you and cancel the sale of the Property. Within ten days of your receipt of our written notice to you, you shall return to us any Net Sale Proceeds we paid to you for such Property plus all costs (including reasonable attorney's fees and standard delivery charges, if applicable) we incur in connection with cancelling the sale and enforcing this provision. Upon our receipt of such payment, we will return such Property to you at your expense, subject to Condition 16, unless we are not able to return the Property due to reasons beyond our control.

### 15. Rescission

We may, in our sole discretion, rescind the sale of the Property if we reasonably determine there are serious grounds for concern that (a) the Property is a "counterfeit" (as defined in the relevant Authenticity Guarantee provided to the Buyer), or in the case of a book or manuscript, the text or illustration is materially defective, (b) any of your representations or warranties are inaccurate, incomplete or breached, or (c) the sale has subjected or might subject us or you to legal liability. In any such case, we will provide you, as reasonably in advance of our determination as circumstances permit, with the basis for our proposed determination (unless we are restricted from doing so on legal or regulatory grounds) and will give due consideration to any matters you wish to raise. Within ten days of your receipt of our written notice to you of a rescission having occurred, you shall return to us the Net Sale Proceeds we paid to you for such Property plus all costs, including reasonable attorney's fees, we incur in connection with rescinding the sale and enforcing this provision. Upon our receipt of such payment, we will return such Property to you at your expense, subject to Condition 16, unless we are not able to return the Property due to reasons beyond our control.

### 16. Retention and Use of Property and Proceeds

We may keep any property and/or any proceeds belonging to you that are under the custody or control of any Sotheby's Group Company (i) until you have paid all amounts you owe any Sotheby's Group Company; (ii) pending resolution of any claim of breach or default we

have against you; and (iii) for a reasonable period in the event of an unresolved issue whereby the release of the property or proceeds might subject us to liability. In addition, we may apply the Net Sale Proceeds against any amounts you owe any Sotheby's Group Company and pay any remainder to you. If you owe any amount pursuant to this agreement that remains unpaid for more than 15 days after we notify you, we may charge you and retain for our account interest on such amount at an annual rate of six percentage points (6%) above the HSBC Bank plc base rate, but in no event greater than the maximum rate permitted by law.

### 17. Photographs and Illustrations

**(a)** Subject to any rights of third parties and any exclusions provided by applicable law, we may use and retain any images, descriptions and other content regarding the Property provided by you.

**(b)** We own the exclusive copyright to all images and written material we produce relating to the Property. You cannot use them without our prior written permission. We may use them as we deem appropriate, to the extent permitted by law, before or after the sale of Property, and we will be solely liable for any losses or damages arising out of our use of such images and material.

### 18. Taxes

**(a)** You acknowledge you are solely responsible for paying, and you will pay, all taxes and/or duties due on all amounts due to you under this agreement. If we withhold tax pursuant to this Condition, such amount will be deducted from the Net Sale Proceeds.

**(b)** You authorize us to collect any taxes, duties, VAT or any other applicable tax on your behalf, where required by law.

**(c)** If any Sotheby's Group Company is required to pay any taxes, duties, VAT or any other applicable tax on your behalf to a tax authority in any country (including outside the sale location), you authorize us to withhold such amounts from the Net Sale Proceeds and, at your request, we will inform you of such withholding and the legal basis for such requirement. If we have already remitted the Net Sale Proceeds, you shall reimburse us for any such amounts we pay, to the extent permissible by law.

**(d)** Where we are required by law to report to tax authorities in any jurisdiction any amount related to this sale, you authorize us to make such reporting.

**(e)** You must provide to us the appropriate information (e.g., information requested on a Form W-9 or equivalent if you are a "U.S. Person", as defined below, or, where applicable, a Form W-8BEN/BEN-E or equivalent if you are a "non-U.S. Person," as defined below) required to legally obtain a reduction to or elimination of tax we may otherwise be required to withhold. A "**U.S. Person**" is a United States citizen or resident, or an entity, including an estate or trust, formed under the laws of the United States. A "**non-U.S. Person**" is anyone who is not a U.S. Person. If you have previously provided the required information to a Sotheby's Group Company and it remains valid as of the date of this agreement with respect to payments hereunder, you authorize such company to release the information to us. If, prior to us remitting a payment to you or on your behalf pursuant to this agreement, any such form or information that you previously provided expires or becomes obsolete or

inaccurate in any respect, you will promptly notify us and provide us with updated and valid information.

**(f)** Failure to provide the appropriate information or to update obsolete information will result in us having to delay payment due to you pursuant to this agreement until such information is provided. If this information is not provided within 30 business days of the Settlement Date or if we are otherwise required to do so by law, we will withhold U.S. tax from the amounts due to you for immediate remittance to the U.S. Internal Revenue Service (the "**IRS**").

**(g)** If you (i) are a U.S. Person or fail to provide the required information as set out in paragraph (e) above, and (ii) have sold property for which the sale proceeds in a calendar year reach the relevant thresholds required by the IRS and some U.S. states, we must report such amount to the IRS (and possibly to U.S. state(s)). If we have made such reporting, we will give you a copy of what we filed.

**(h)** You acknowledge that no one within Sotheby's Group has provided tax advice to you or for your benefit in connection with this agreement.

### 19. Limitation of Liability

**(a)** You acknowledge that attribution of the Property is a matter of opinion only and not a statement of fact, and is dependent upon, among other things: information you provide to us, the condition of the Property, the degree of research, examination or testing that is possible or practical in the circumstances, and the status of generally accepted expert opinion, research and scientific or technical analysis at the time of cataloguing. You acknowledge we have no duty to include in any description of the Property a reference to any specific third-party attribution nor to the possibility of other views or potential attribution, whether positive or negative.

**(b)** We make no guarantees, representations or warranties to you with respect to the Property, its authenticity, attribution, authorship, origin, date, age, period, culture, source, legal title, condition, value, anticipated selling price or otherwise.

**(c)** We will not be liable for any acts or omissions by us in connection with the preparation for or conduct of the auction or sale of the Property. We will not be liable for errors or omissions in the catalogue or other descriptions of the Property, though if we discover a material error or omission in such materials prior to the sale, we will provide a correction, time permitting.

**(d)** We will not be liable to you for any errors or failure to execute bids placed by bidders through our online platform, including, without limitation, errors or failures caused by (i) any loss of connection between bidders and our online platform; (ii) a breakdown or problem with our online platform or other technical services; or (iii) a breakdown or problem with a bidder's internet connection, computer, mobile device or system.

**(e)** Without prejudice to Conditions 19(a)-(d), our liability to you under this agreement will not exceed the Property Value for the relevant Property, except in the case of our willful misconduct, gross negligence or fraud, or death or personal injury caused by our negligent acts or omissions.

**(f)** Neither you nor we will be liable for any special, consequential, indirect, or incidental damages.

Sotheby's

## 20. Force Majeure

(a) We will not be liable for or be deemed to have defaulted under or breached this agreement for failure, except with respect to payment obligations, or delay in fulfilling or performing any of our obligations to the extent, and for so long as, such failure or delay is caused by events beyond our reasonable control, including without limitation, fire, flood, natural disaster or other event caused by forces of nature, riot, strike or other civil or labor unrest, inability to secure sufficient labor, power or necessary equipment, act of war, armed conflict, terrorist attack, governmental action or regulation, outbreak of disease, public health emergency, epidemic, nuclear or chemical contamination, or any other cause that we could not have prevented with reasonable care (any of the foregoing, a "**Force Majeure Event**").

(b) If a Force Majeure Event impedes or interferes with our ability to hold a sale or to perform our obligations relating to the sale of the Property, we may modify the sale or our obligations relating to the sale of the Property in various ways, including, without limitation: (1) postponing or canceling a sale, (2) changing the location of a sale, (3) changing the platform for or format of a sale (including but not limited to from live to timed online-only auction), (4) rescheduling the sale of the Property to a different sale, and/or (5) modifying or canceling any planned marketing of the Property. In such circumstances, we shall promptly notify you. If the Property will be offered in a different sale than originally scheduled, the sale of the Property will be subject to the Conditions of Business for Buyers applicable to the sale in which the Property will then be offered.

## 21. Confidentiality and Data Protection

(a) Neither you nor we may disclose the terms of this agreement to any third party without the prior written consent of the other party, except (i) to attorneys, insurers, contractors, agents, advisors or financial participants on a need-to-know basis and provided they are subject to confidentiality obligations that are no less restrictive than this provision, (ii) to other Sotheby's Group Companies, or (iii) to comply with valid legal process or regulatory authority compelling the disclosure, provided, where permitted to do so by law, the disclosing party first gives the other party prompt written notice of such service of process and allows the other party an opportunity to seek a protective order.

(b) We will hold and process your personal information and may share it with another Sotheby's Group Company for use as described in, and in line with, our Privacy Policy published on our website at https://www.sothebys.com/en/privacy-policy or available on request by email to enquiries@sothebys.com.

## 22. Reconsignment

(a) Any Property designated on the Property Schedule as for sale at a different selling location will be offered for sale by our affiliated Sotheby's Group Company with offices in the location listed on the Property Schedule. With respect to such Property only, we assign our rights and obligations under this agreement to the relevant Sotheby's Group Company, and you hereby consent to such assignment.

(b) We may from time to time decide Property should be offered for sale by another Sotheby's Group Company at a different selling location, and if we do so, we will notify you. In any such case, we will assign our rights and obligations under this agreement with respect to the reconsigned Property only to the relevant Sotheby's Group Company, unless you object in writing within 14 days of our notice of reconsignment.

(c) The following will apply with respect to the reconsigned Property only: (i) the Net Sale Proceeds for such Property will be remitted in the currency in which the sale is conducted, and all local charges and taxes will apply, (ii) references to the Conditions of Business for Buyers will mean those applicable to the relevant sale, (iii) the sale of the Property will be subject to the laws of the jurisdiction of the relevant sale, (iv) references to "we", "us" and "our" will be deemed to mean the Sotheby's Group Company that will offer the Property for sale under this agreement, and (v) these Conditions of Business for Sellers will continue to apply as between you and us and will prevail in the event of any conflict. In addition, with respect to any Property reconsigned to the United Kingdom, the European Union or Switzerland, settlement of the Net Sale Proceeds will be on the later of the Settlement Date or, if applicable, upon the expiration of the Consumer Cancellation Period.

## 23. Miscellaneous

(a) You will provide to us, upon our request, verification of identity and any additional information required to comply with our Know Your Client requirements (including but not limited to if you are acting as agent on behalf of a principal, you will disclose to us the identity of your principal) or applicable law or to evidence your authority to sign this agreement. If you fail to satisfy our Know Your Client requirements, we may (i) withhold any amounts due to you under this agreement until you satisfy such requirements, or (ii) terminate this agreement upon written notice to you. In addition, if you are an agent acting on behalf of a principal, you will retain and make available upon request the documentation evidencing your due diligence on your principal for at least five years or for such other period as required under applicable law.

(b) This agreement is intended to create a consignment of the Property. You have consigned the Property to us as bailee and to enable us to perform our obligations as your agent, during the period of this consignment, for the sale of the Property.

(c) This agreement, including Parts A, B and C, constitutes the entire agreement between us and you with respect to this consignment and supersedes all prior or contemporaneous written, oral or implied understandings, representations or agreements relating to the subject matter of this agreement. You confirm that you have not relied upon, and waive all your rights and remedies available in relation to, any express or implied representation, warranty and/or promise outside of this agreement. If any part of this agreement is deemed invalid or unenforceable, such invalidity or unenforceability will not affect the remaining provisions of this agreement, which will remain in full force and effect. No provision of this agreement may be amended unless you and we agree in writing (including by email) to do so.

(d) This agreement will remain in force in the event of your death and is binding upon, and inures to the benefit of, you, your estate, heirs, executors, devisees, representatives, administrators, successors and permitted assigns.

(e) Other than as permitted in Condition 22, neither you nor we may assign your or our rights or delegate your or our respective obligations under this agreement without the prior written consent of the other party.

(f) You may not grant a security over the Property or do anything that might result in a lien, claim or encumbrance on the Property from the date on which you execute this agreement unless and until the Property is released to you in accordance with the terms of this agreement.

(g) If we receive a subpoena or an order from a court, body or authority of competent jurisdiction relating to the Property, the agreement, or to you or your principal, you agree to pay us the costs we incur, including reasonable attorney's fees, in responding to the subpoena or complying with the relevant order.

(h) You have had the opportunity to consult an attorney of your choosing before signing this agreement, and you acknowledge we have not provided legal advice to you or for your benefit in connection with this agreement.

(i) To the extent otherwise applicable, the Vienna Convention on the International Sale of Goods is excluded.

(j) The provisions in this agreement that by their nature are intended to survive termination or the completion of the transactions contemplated (including, by way of illustration only, those relating to returning the Property, liability and indemnity, confidentiality, choice of law and dispute resolution) will so survive.

(k) This agreement may be executed in counterparts, each of which will be deemed an original and together constitute one instrument. Signatures sent by facsimile or email transmission or other electronic signatures are valid and binding and will be deemed an original.

## 24. Law and Jurisdiction

This agreement and any dispute or claim (including non-contractual disputes or claims) arising out of or in connection with this agreement, its subject matter or its formation, existence, negotiation, validity, termination or enforceability will be governed by and construed in accordance with English law without regard to conflict of law rules or principles and shall be subject to the exclusive jurisdiction of the Courts of England and Wales. Pursuant to the Contracts (Rights of Third Parties) Act 1999 (the "**Act**"), the Buyer and any Sotheby's Group Company may in their own right enforce the provisions of this agreement applicable to them. No other party shall have any right under the Act to enforce any term of this agreement. The rights of the parties to rescind or vary this agreement are not subject to the consent of any other person. You irrevocably consent to service of process or any other documents in connection with proceedings in the Courts of England and Wales by personal service, delivery by mail, or delivery by email at your last address known to us or any other usual address, or in any other manner permitted by English law, or by the law of the place of service.

13

0G870 - R49
Franklin County Ohio Clerk of Courts of the Common Pleas- 2024 May 28 7:44 PM-20CV003954
Case 2:25-cv-00899-MHW-CMV Doc #: 1-2 Filed 11/18/24 Page 277 of 447 PAGEID #: 641

# EXHIBIT B

**IN THE COURT OF COMMON PLEAS**
**FRANKLIN COUNTY, OHIO**
**GENERAL DIVISION**

| | | |
|---|---|---|
| Kegler, Brown, Hill & Ritter Co., LPA, | : | Case No.: 20CV-3954 |
| | : | |
| Plaintiff, | : | |
| vs. | : | Judge Bill Sperlazza |
| | : | |
| Carlo M. Croce, | : | |
| | : | |
| Defendant. | : | |

**ORDER**
**GRANTING MOTION OF RECEIVER (A) TO EMPLOY SOTHEBY'S AS AN**
**AUCTIONEER; (B) TO SELL CERTAIN ART OF THE DEFENDANT; AND (C)**
**REQUEST FOR AN IMMEDIATE HEARING**
**AND**
**ORDER TO VACATE HEARING**

This matter came before the court upon the *Motion of Receiver (A) to Employ Sotheby's as an Auctioneer; (B) to Sell Certain Art of the Defendant; and (C) Request for an Immediate Hearing* filed by Myron Terlecky, the court-appointed receiver (the "Receiver") on May 23, 2024 (the "Motion"). Through the Motion, the Receiver seeks authority to employ Sotheby's to sell a certain group of paintings from the art collection of Defendant, specifically the *Man with Turban, Saint Cecilia Playing the Organ*, and *Madonna Surrounded by Musical Angels* (the "Art") at a July 3-4, 2024, auction sale of old master paintings to take place in London, England (the "July Art Auction").

The relevant terms of the July Art Auction are that Sotheby's will charge and retain a seller's commission equal to ten percent (10%) of the sale price, subject to a maximum of £40,000[1] and a £500 charge for any unsold item. If the sale price is greater than the final high estimate, a success fee equal to two percent (2%) of the sale price will also be

---

[1]The commission is listed in English currency. The current conversion rate is $1.27 to 1 Pound Sterling.

charged. Further, there will be sale costs charged associated, such as transporting the Art to London.

Counsel for the Plaintiff and Defendant indicated to chambers that they did not request a hearing on this Motion. Thus, based upon the motion and in accordance with the terms of the *Order Appointing Receiver* entered on April 11, 2024, the Motion is **GRANTED**.

It is therefore ORDERED that the Receiver be, and he hereby is, authorized to employ Sotheby's to sell the Art at the July Art Auction on the terms set forth in the Motion; it is further,

ORDERED that Sotheby's be, and it hereby is, authorized to charge and retain a seller's commission equal to 10% of the sale price, subject to the maximum amount set forth in the Motion and the minimum charge for any unsold item. If the sale price of any item of Art is greater than the final high estimate, a success fee equal to 2% of the sale price is authorized; it is further,

ORDERED that the costs associated with the July Art Auction, including but not limited to transporting the items of Art to London, England, shall be charged from the sale price.

The Receiver, within 14 days of the July Art Auction, shall file a report of the sale results.

The hearing scheduled for May 30, 2024 at 9:00a.m. via Zoom is hereby **VACATED.**

**IT IS SO ORDERED.**

Franklin County Court of Common Pleas

**Date:**           05-28-2024

**Case Title:**     KEGLER BROWN HILL & RITTER CO LPA -VS- CARLO M
                    CROCE

**Case Number:**    20CV003954

**Type:**           ORDER

It Is So Ordered

/s/ Judge Bill Sperlazza

Court Disposition

Case Number:  20CV003954

Case Style:  KEGLER BROWN HILL & RITTER CO LPA -VS- CARLO M CROCE

Motion Tie Off Information:

1.  Motion CMS Document Id: 20CV0039542024-05-2399970000
    Document Title: 05-23-2024-MOTION - NON-PARTY: MYRON N. TERLECKY RCVR - TO EMPLOY AUCTIONEER, TO SELL, AND REQUE
    Disposition: MOTION GRANTED

# EXHIBIT C

## IN THE COURT OF COMMON PLEAS
## FRANKLIN COUNTY, OHIO

| | | |
|---|---|---|
| Kegler, Brown, Hill & Ritter Co., LPA, | : | Case No.: 20CV-3954 |
| | : | |
| Plaintiff, | : | |
| vs. | : | Judge Bill Sperlazza |
| | : | |
| Carlo M. Croce, | : | |
| | : | |
| Defendant. | : | |

### FIRST REPORT OF RECEIVER AND RECEIVERSHIP PLAN

Myron N. Terlecky, the Court appointed receiver (the "Receiver") of certain of the assets of the Defendant, Carlo M. Croce ("Dr. Croce"), hereby submits this *First Report oof Receiver and Receivership Plan* (the "Report and Plan"), pursuant to Local Rule 66.06 of the Franklin County Court of Common Pleas (the "Local Rules") and this Court's *Order Appointing Receiver* entered on April 11, 2024 (the "April 11 Order").

### A.      INTRODUCTION

1.      The Plaintiff, Kegler, Brown, Hill & Ritter Co., LPA ("KBHR"), obtained a judgment against Dr. Croce on December 8, 2022, in the amount of $1,068,542.80, together with interest and Court costs (the "Judgment").

2.      Dr. Croce filed a Notice of Appeal of the Judgment on January 5, 2023.  The Appeal remains pending.

3.      Local Rule 66.06 provides that: "(a) the outset of the Receivership, or soon thereafter as information becomes reasonably available, the Court shall be provided with a written plan for the Receivership."  Local Rule 66.06(A).  The Local Rules set out specific categories of information on which the Court requires information.

1

4.      Within this Report, the Report sets for the Receivership Plan on those items that are relevant in this case:

>    a.      the assets of Dr. Croce;
>
>    b.      anticipated expenditures and administrative costs;
>
>    c.      duration of administration; and,
>
>    d.      litigation or administrative proceedings affecting administration.

5.      The Receiver respectfully requests that the Court, upon analysis of the contents of this Report and Plan, enter an Order approving this Report and Plan.

## B.      RECEIVER'S PLAN

6.      **Status of Operations (66.05(B)(2))**.  On or about the first week of May 2024, real estate owned by Dr. Croce and located in the vicinity of Philadelphia, Pennsylvania was sold, and KBHR received the sum of $527,243.49 from the sale proceeds.  As a result, the balance owed to KBHR is $342,350 at 3% interest.

Given the balance owe on the Judgment and the valuation of certain of the assets of Dr. Croce, and certain other events, the Receiver limited his inventory of certain of the Art[1] .  This limited inventory was undertaken given the current amount of the Judgment as more fully described herein.  Further, an auction estimate was provided by Sotheby's Financial Services in June 2023 (the "Auction Estimate Inventory") and was used by the Receiver to conduct the inventory.  A copy of the Auction Estimate Inventory is attached hereto as Exhibit A.  The Receiver identified all paintings in the Auction Estimate Inventory as being in the residence of Dr. Croce.  Considering what may be described as cooperation with this process by Dr. Croce, the Receiver has not removed all the Art from the residence of Dr. Croce.

---

[1] Capitalized terms shall have the same meaning ascribed to them in the April 11 Order.

As set forth herein, certain of the Art was obtained and shipped to New York so it may be sold at auction as more fully described below.

7.     **Significant Assets (66.05(B)(3))**.  While Dr. Croce has a significant Art collection, given the balance that is owed to KBHR, the Receiver sought and obtained an *Order Granting Motion of Receiver (A) to Employ Sotheby's as an Auctioneer; (B) to Sell Certain Art of the Defendant; and (C) Request for an Immediate Hearing and Order to Vacate Hearing* entered on May 28, 2024, (the "Order to Sell Art").  The Order to Sell Art specifically authorized the Receiver to employ Sotheby's to sell a certain group of paintings from the art collection of Dr. Croce, specifically the *Man with Turban, Saint Cecilia Playing the Organ,* and *Madonna Surrounded by Musical Angels* at a July 3 and 4, 2024 auction sale of old master paintings to take place in London, England (the "July Art Auction").  Rather than sell any Art unnecessarily, the Receiver, in effort to not be punitive and to resolve the issues of the appeal by Dr. Croce of the April 11 Order[2], reached an agreement to have up to three (3) paintings sold at the July Art Auction with the hope that the net proceeds will be sufficient to pay the costs of this Receivership and the balance owed to KBHR.

8.     **Costs to be Incurred (66.05(B)(4))**.  At this early stage, the Receiver is unable to make an accurate projection of the total cost to be incurred in the administration of this Receivership.

As set forth in the Motion which resulted in the Court entering the Order to Sell Art, the relevant terms of the sale are that Sotheby's will charge and retain a seller's commission equal to ten percent (10%) of the sale price, subject to a maximum of £40,000[3] and a £500 charge for any

---

[2] The Appeal of the April 11 Order has been dismissed.
[3] The commission is listed in English currency.  The current conversion rate is $1.27 to 1 Pound Sterling.

unsold item. If the sale price is greater than the final high estimate, a success fee of two percent (2%) of the sale price will also be charged. Further, there will be sale costs charged, such as transporting the Art from Columbus, Ohio, to New York, New York, then to London, England.

9. The Receiver may submit an application for his fees and costs after receiving the proceeds from the July Art Auction. The amounts requested should not be indicative of the total fees in the event the proceeds from the July Art Auction are not sufficient to pay in full the fees and expense of the Receiver and his counsel, and the claim of KBHR in full.

10. **Expected Duration (66.05(B)(5))**. It is difficult to provide an estimated duration of the Receivership until the proceeds of the July Art Auction are received. In the event the proceeds from the July Art Auction are insufficient to pay the claim of KBHR in full, the Receiver would seek authority to sell one or more additional paintings so that the claim of KBHR is paid in full. It should be noted that KBHR is engaged in additional garnishment proceedings which, if successful, will reduce the balance owed on the Judgment.

Based upon the foregoing, the Receiver would speculate that this matter should be finalized, and his services terminated within eight to twelve months, but hopefully sooner.

11. **Liquidation of Assets(66.05(B))**. As set forth in the Order to Sell Art, and as more fully described herein, the Receiver is liquidating certain of the Art of Dr. Croce. The results of the July Art Auction will dictate whether additional assets will need to be liquidated to pay in full the costs of administration and the claim of KBHR.

12. **Litigation (66.05(B)(8))**. The Receiver is not anticipating any litigation other than the appeal referenced herein. There is litigation involving the efforts of KBHR to garnish and/or execute on other assets of Dr. Croce.

4

## C.    CONCLUSION

The Receiver reports that matters are in order and moving forward.  The results of the July Art Auction will dictate future actions to be taken.  The Receiver will report back to the Court with additional reports at appropriate and required times, specifically, the results of the July Art Auction.

The Receiver respectfully requests that the Court enter an Order approving this First Report of Receiver and Receivership Plan and granting such other and further relief as is appropriate.

Respectfully submitted,


 /s/ Myron N. Terlecky
Myron N. Terlecky (0018628)
Strip, Hoppers, Leithart, McGrath & Terlecky Co., LPA
575 South Third Street
Columbus, Ohio 43215-5759
T: (614) 228-6345     F: (614) 228-6369
Email: mnt@columbuslawyer.net
Receiver

### CERTIFICATE OF SERVICE

      The undersigned hereby certifies that on June 7, 2024, a copy of the foregoing FIRST REPORT OF RECEIVER AND RECEIVERSHIP PLAN was submitted to the Court electronically and served on the following registered eFiling participants, **electronically**, through the Court's eFiling system at the email address registered with the Court:

Electronic Service through the Court's eFiling system is proper pursuant to Section X(C)1 of the Franklin County Court of Common Pleas Second Amended Administrative Order regarding electronic filing of court documents.

And by regular U. S. mail service, postage prepaid, as follows:

None


/s/ Myron N. Terlecky
Myron N. Terlecky (0018628)

# EXHIBIT A

Franklin County Ohio Clerk of Courts of the Common Pleas- 2024 Jun 03 9:26 AM-20CV003954

Property of Carlo Maria Croce

Sotheby's

CROCE_EX_2-000051

# Property of Carlo Maria Croce

AUCTION ESTIMATE FOR
SOTHEBY'S FINANCIAL SERVICES COLLATERAL LOAN

PRIVATE SALE SCHEDULE

Prepared by Sotheby's, 1334 York Avenue, New York, New York 10021, +1 212 606 7000
13 June 2023 | Valuation Number 70337230

CROCE_EX_2-000052

SUMMARY

AUCTION ESTIMATE

| PAGE | CONTENTS | VALUE |
|---|---|---|
| 5 | Fine Art | $2,260,000 - 3,260,000 |
| 11 | Certification | |

The enclosed values are to provide you with approximate private treaty sale estimates for the Property. These estimates are intended to provide a general indication of our private treaty sale asking price. Sotheby's reserves the right to review and revise these estimates should the Property be consigned for private sale.

The enclosed estimates are preliminary only and subject to change based on firsthand inspection and further research. We have provided the enclosed estimates based on our assumption that the property can be offered freely and openly in the international art market.

Sotheby's

CROCE_EX_2-000053

SUMMARY

PRIVATE SALE VALUE

| PAGE | CONTENTS | VALUE |
|------|----------|-------|
| 5 | Fine Art | $800,000 |
| 11 | Certification | |

The enclosed values are to provide you with approximate private treaty sale estimates for the Property. These estimates are intended to provide a general indication of our private treaty sale asking price. Sotheby's reserves the right to review and revise these estimates should the Property be consigned for private sale.

The enclosed estimates are preliminary only and subject to change based on firsthand inspection and further research. We have provided the enclosed estimates based on our assumption that the property can be offered freely and openly in the international art market.

CROCE_EX_2-000054

FINE ART

---

**1**
64FDZ

**GIOVANNI FRANCESCO BARBIERI, CALLED IL GUERCINO**
*Man with turban*
Oil on canvas
87.6 by 65 cm

AE: $300,000 - $500,000

Estimate pending further research.

PROVENANCE
Anonymous sale, Paris, Piasa, 25 June 1999, lot 4 (as Attributed to Guercino);
Cesare Lampronti;
From whom acquired by the present collector.



**2**
CM9DR

**JACOPO DA PONTE, CALLED JACOPO BASSANO**
*Saint John the Baptist taking leave of his parents*
Oil on canvas
47 by 57 cm

AE: $60,000 - $80,000

PROVENANCE
With Walpole Gallery, London, 1988;
Anonymous sale, London, Sotheby's, 14 December 2000, lot 68, where unsold;
Anonymous sale ("Property of a Deceased's Estate"), London, Sotheby's, 12 July 2001, lot 128.

EXHIBITED
London, Walpole Gallery, *Treasures of Italian Art*, 19 April – 24 June 1988, no. 7.

LITERATURE
*Treasures of Italian Art*, exhibition catalogue, London 1988, p. 24, cat. no. 7, reproduced.;
A. Ballarin, *Jacopo Bassano*, Padua 1996, vol. II, tome III, cat. no. 346, reproduced.



CROCE_EX_2-000055

Case 2:20-cv-02900-SDM-EAS Doc # Filed 12/13/2024 Page 43 of 47 PAGEID # 657

FINE ART

**3**
CDM25

### BERNARDO CAVALLINO
*Healing of Tobit*
Oil on canvas
97 by 128 cm

AE: $100,000 - $150,000

PROVENANCE
Private collection, Naples, 1930.

LITERATURE
N. Spinosa, *Grazia e tenerezza 'in posa,' Bernardo Cavallino e il suo tempo, 1616-1656*, Rome 2013, pp. 283-284, cat. no. 18.1, reproduced in black and white.



**4**
CM9D5

### BERNARDO CAVALLINO
*Saint Ursula*
Oil on canvas
64 by 52 cm

AE: $100,000 - $150,000

PROVENANCE
Anonymous sale, Rome, Christie's, 18 June 2002, lot 725 (as Attributed to Antonio de Bellis).

LITERATURE
Wiedmann, "Francesco Guarini e Antonio De Bellis 'tutti discepoli del Cavalier Massimo Stanzione,'" in *Francesco Guarini, Nuovi contributi*, M.A. Pavone (ed.), Naples 2012, p. 58 (as Antonio De Bellis);
N. Spinosa, *Grazia e tenerezza 'in posa,' Bernardo Cavallino e il suo tempo 1616-1656*, Rome 2013, p. 397, cat. no. 132 (under works in precarious states of conservation), reproduced in black and white.



**5**
CM9DC

### ANTIVEDUTO GRAMATICA
*Saint Cecilia playing the organ*
Oil on canvas

AE: $80,000 - $120,000



CROCE_EX_2-000056

FINE ART



6
CBM29

**GIOVANNI LANFRANCO**
*Diana playing with three children*
Oil on canvas
92 by 108 cm

AE: $150,000 - $200,000

PROVENANCE
Taddeo Barberini, Prince of Palestrina and nephew of Pope
Urban VIII;
Thence by descent to his son, Maffeo Barberini;
Aristocratic family collection for generations.
Thence by inheritance to a private, noble collector, Vienna;
By whom anonymously sold, Zurich, Koller, 22 March 2013, lot
3107 (as Lanfranco)

LITERATURE
E. Schleier, "Un quadro barberiniano di Lanfranco ritrovato:
'Diana al bagno con tre putti,'" in *Paragone*, no. 116 (773), July
2014.



7
CM90H

**CARLO MARATTA**
*Madonna with a book surrounded by angels playing
music*
Oil on canvas
74 by 62 cm

AE: $60,000 - $80,000

PROVENANCE
Private collection, Rome;
Anonymous sale, Lempertz, 12 May 2012, lot 1259A, where
unsold.

CROCE_EX_2-000057

Case: 21CV-00399 Franklin County Ohio Clerk of Courts of the Common Pleas 2024 Jun 07 9:26 AM-21CV003954 659

8
CDM20

### THE MASTER OF THE ANNUNCIATION TO THE SHEPHERDS
*Rest on the flight into Egypt*
Oil on canvas
125 by 175 cm

AE: $200,000 - $300,000

PROVENANCE
Genoa, Casa d'aste Cambi, 15 April 2014, lot 63 (as Juan Do:
with its pair, an Adoration of the Shepherds, now in private
collection, London and France).

LITERATURE
N. Spinosa, *Il maestro degli Annunci ai pastori e i pittori dal
"tremendo impasto" (Napoli 1625-1650)*, Rome 2021, pp. 90-91,
cat. no. A23b, reproduced in color p. 91.



9
4FTCJ

### JUSEPE DE RIBERA
*Madonna and Child*
Oil on canvas
105 by 98 cm

AE: $150,000 - $200,000

PROVENANCE
Randone collection, Rome;
Anonymous sale, Milan, Sotheby's, 1 June 2004, lot 153;
Where acquired by the present owner.

LITERATURE
N. Spinosa, *Ribera*, Naples 2003, p. 300, under cat. no. A264;
N. Spinosa, *Ribera, La obra completa*, Milan 2008, p. 457,
under cat. no. A318.



10
CM9DF

### ATTRIBUTED TO ORAZIO RIMINALDI
*Cupid victorious*
Oil on canvas

AE: $60,000 - $80,000



CROCE_EX_2-000058

FINE ART

---

### BARTOLOMEO SCHEDONI
*Beheading of Saint John the Baptist*
Oil on walnut panel

AE: $300,000 - $400,000

LITERATURE
E. Negro, in *Ducato di Modena & Reggio 1598-1859: Lo stato, la corte, le arti*, P.V. Ferrari (ed.), Modena 2007, p. 223, fig. 12 (as Costabili version);
N. Roio, "Bartolomeo Schedoni e Leonello Spada, alcune opere sconosciute di due 'caravaggisti' padani" in *Valori Tattili* 1 (2013), p. 53, reproduced fig. 7.



### VIRGINIA DA VEZZO
*Allegory of painting*
Oil on canvas
95 by 132 cm

AE: $400,000 - $600,000
PVT: $800,000

This estimate is pending further research.

LITERATURE
C. Lollobrigida, "Virginia da Vezzo tra Roma e Parigi. Verso un primo catalogo ragionato," in *Scritti di donne, 40 Studiose per la storia dell'arte*, Foligno 2022, p. 249, reproduced fig. 3 (as Virginia da Vezzo, *Allegory of painting*).





CROCE_EX_2-000059

13
640v2

### SIMON VOUET
*Saint Francis receiving the stigmata*
Oil on canvas
200 by 142 cm

AE: $300,000 - $400,000

PROVENANCE
Commissioned by Paolo Alaleoni for the Alaleoni family chapel
in San Lorenzo in Lucina, Rome, 1623.

LITERATURE
M. Marini, "Ricerche negli archivi e nei musei. l'opera di Simon
Vouet nella Cappella Alaleoni in San Lorenzo in Lucina," in *Arte
illustrata* 58, no. 7 (July 1974), pp. 197-203;
M. Marini, "La Pala d'Altare di Simon Vouet per la cappella
Alaleoni in San Lorenzo in Lucina," in *Il Seicento* 1-2 (1976), pp.
157-163;
E. Schleier, in *Simon Vouet, les annees italiennes, 1613-
1627*, exhibition catalogue, Paris 2007, p. 116, reproduced fig.
67.



CROCE_EX_2-000060